IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | HON. JEROME B. SIMANDLE |
| v. | Criminal No. 05-313 (JBS) |
| CHRISTOPHER BOOKER, | |
| Defendant. | **OPINION** |

APPEARANCES:

Christopher J. Christie
United States Attorney
By:  Joseph T. Labrum, III
     Special Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
615 Chestnut Street
Suite 1250
Philadelphia, Pennsylvania 19106
     Attorney for the United States of America

Lori M. Koch, Assistant Federal Public Defender
FEDERAL PUBLIC DEFENDER'S OFFICE
800-840 Cooper Street
Suite 350
Camden, New Jersey 08102
     Attorney for Defendant Christopher Booker

**SIMANDLE**, District Judge:

On October 29, 2004, while cleaning Room 309 at the Best Western Envoy Hotel in Atlantic City, New Jersey, the hotel maid discovered two guns in the bathroom trash can.  She immediately notified the hotel manager who, in turn, notified the Atlantic City Police Department.  The room was registered to Defendant Christopher Booker.

Without securing a warrant, several officers were admitted by the hotel manager and entered the room, which was unoccupied at the time, and seized the guns.  The manager then locked out the room by changing the key card and the officers set up surveillance for Booker throughout the hotel.  Several hours later, Defendant and a female companion arrived outside the door of Room 309, at which time they were both arrested.  The incident search of Booker's jacket revealed roughly 149 grams of crack cocaine.

Defendant was charged with gun possession and other drug-related offenses.[1]  Defendant has moved to suppress the guns, the crack cocaine, and certain statements made during and following the arrest.  The Court held a suppression hearing and heard extensive oral argument by counsel.  For the following reasons, Defendant's motion to suppress will be denied in its entirety.[2]

---

[1] Defendant was charged in the Eastern District of Pennsylvania in a three count criminal indictment with conspiracy to distribute and possess with intent to distribute more than 50 grams of cocaine base in violation of 21 U.S.C. § 846, possession with intent to distribute approximately 149.5 grams of cocaine based in violation of 21 U.S.C. § 841(a)(1), and possession of two firearms in furtherance of a drug trafficking felony in violation of 18 U.S.C. § 924(c).  The case was transferred to this district at Defendant's request.

[2] Certain of the statements Defendant seeks to suppress relate to conversations with David Blickley, a fellow inmate who the Government expects to call as a witness at trial.  The Government did not produce Blickley, however, as a witness at the suppression hearing.  As the Court noted at the August 11, 2005 hearing, no ruling will be made regarding those statements and related statements made by Defendant to FBI Special Agent Roselli on April 4, 2005 until Defendant has had an opportunity to cross-examine Blickley.

## I.   BACKGROUND

Two days before the events in question in this suppression motion, on October 27, 2004, Officer Paul Petinga of the Atlantic City Police Department, while on routine patrol, confronted Defendant Booker outside of the Best Western Envoy Hotel ("Hotel"), located at St. James and Pacific Avenues in Atlantic City, New Jersey.  (Petinga Tr. 8:25-9:16.)  Officer Petinga had noticed Booker loitering in front of the Hotel, an area known by Petinga to be a "high drug crime area," at approximately 3:30 a.m.  (Id. at 8:1-24.)  At approximately 6:00 a.m., having driven past Booker outside the Hotel between four and five times, Officer Petinga conducted a Terry stop.  After Petinga asked Booker several questions and advised Booker that the neighborhood was a high crime area, Defendant informed the officer that he was in town for a court appearance that morning in New Jersey Superior Court, Mays Landing.  (Id. at 8:1-11.)  At that point, Booker provided Petinga with identification, (Govt. Ex. 13,) and informed him that he was staying at the Hotel.  (Id. at 8:7-16.) Petinga ran a check of Booker's identification, which did not reveal any  outstanding warrants for Mr. Booker's arrest.  (Id. 16:9-17:7.)  The following day, however, another officer telephoned Petinga, who was off-duty at the time, and informed him that there was, in fact, an outstanding NCIC warrant for Booker's arrest.  (Id. 42:18-43:13.)

On October 29, 2004, in the early afternoon, Officer Petinga received a call while off-duty from Sunil Pillay, the manager of the Hotel and a longtime friend, informing him that the Hotel maid had just found two guns in a trash can in one of the Hotel's rooms.[3] (Id. at 11:17-12:2; 14:23-25.)  Petinga immediately called Officer Michael Gavin, who was on-duty at the time, and advised him of what the Hotel staff had discovered.  Petinga and Gavin arrived on the scene within several minutes.  With the assistance of Mr. Pillay, the officers then confirmed the identity of the occupant of Room 309 by checking the Hotel's registry, which included a copy of Mr. Booker's Pennsylvania identification card, the same one Booker had produced to Officer Petinga two days prior.  (Id. at 15:7-24.)

Meanwhile, Officers Allen Hines and Sabina Walsh as well as Sergeant Mazur had arrived at the Hotel.  (Id. at 17:12-14.)  Mr. Pillay then escorted the five officers to Room 309.  (Id.)  According to Petinga's testimony, the officers were concerned for several reasons that there might be someone in the room.  First, there were three separate entrances by which one could gain access to the hotel.  (Id. 43:14-44:25; Pillay Tr. at 146:20-22.)

---

[3] The maid, Petra Ramirez, was never interviewed by the police following the incident.  She did not return to work, nor did she notify Mr. Pillay that she would not be returning.  Her whereabouts are currently unknown by the Atlantic City Police Department.  (Petinga Tr. at 46:18-47:5.)  Unfortunately, it appears that Ms. Ramirez was too frightened by her discovery of the guns to return to work.  (Pillay Tr. at 145:12-23.)

In essence, the officers were fearful that Booker or someone else had slipped by the officers and into the room through one of those entrances.  Second, the officers were not certain whether there was a connecting door to Room 309 from one of the adjacent rooms.  (Petinga Tr. at 44:8-11.)  Finally, the officers did not know whether there were additional occupants besides Booker in the room.  (Id. at 43:14-44:25.)  For those reasons, Pillay accessed the lock to Room 309 with a key card and stepped out of the way immediately, allowing the officers to enter Room 309 with guns drawn.  (Id. 43:14-16; Pillay Tr. 147:1-4.)

Once inside the room, the officers confirmed that the guns were in the bathroom trash can, located a mere three feet from the entrance to Room 309.  (Petinga Tr. at 52:17-53:11.)  The guns were clearly visible, as they were covered by nothing but several pieces of scrap paper.  (Govt. Ex. 2.)  After confirming the presence of the guns, the officers notified the identification bureau who then came to the Hotel, photographed the contents of the trash can, and recovered the guns.  (Petinga Tr. 18:1-16.)  No other search of the Room was conducted by any of the officers.  (Id. at 18:16-23.)

Meanwhile, Officer Pincus and Detective Leonard had arrived. After going to Room 309, Pincus ran a criminal history on Defendant revealing that Booker had prior violent arrests leading to at least one conviction.  (Pincus Tr. at 63:16-64:3.)

Following the recovery of the weapons, at approximately 3:00 p.m. the officers locked out Room 309 and set up surveillance both in the Hotel lobby and in Room 308, directly across the hall from the target room.

At approximately 7:00 p.m., Officer Andrews, who was stationed at the front desk, notified Officer Pincus and his partner, who were stationed in Room 308, that Booker and a female companion had entered the Hotel lobby.  (Id. at 65:16-24.) Pincus immediately went to the door of his room and, having seen the photograph of Booker from the hotel registry, was able to identify Booker through the peep hole.  (Id. at 66:4-16.)  Pincus and his partner then exited Room 308 and entered the hall with guns drawn.  Pincus advised Booker that he was under arrest and ordered him to get down on his knees and put his hands in the air.  (Id. 66:17-21.)

As Booker raised his hands in the air, he asked Pincus the reason for the arrest.  Pincus replied that the officers had found something in Booker's hotel room, to which Booker responded, "guns."  (Id. at 67:14-20.)  With Defendant on the ground, Pincus kicked from Booker the jacket on which he had been leaning.  Pincus then cuffed and searched Booker.  (Id. at 67:24-68:5.)  Pincus also searched Booker's jacket, revealing two packages containing a total of approximately 149 grams of cocaine base (crack).  (Id. at 68:6-11.)  The officers also arrested

6

Booker's female companion, Leslie Thompson.  After the arrest and
search, the officers walked Booker into the surveillance room,
Room 308, and walked Thomspon into the target room, Room 309.
Booker subsequently signed a consent to search form, authorizing
the officers to conduct a comprehensive search of Room 309.[4]
(Govt. G-12.)

     The following month, in November 2004, the Federal Bureau of
Investigation became involved in the Booker investigation.
(Roselli Tr. at 168:14-22.)  Specifically, following a November
2, 2004 interview with Booker, certain detectives from the Darby
Borough Police Department contacted Case Agent Roselli and
informed him that Booker had information pertaining to the
robberies which Roselli was investigating at the time.  (Id. at
168:20-169:7.)  On November 30, 2004, Roselli traveled to
Atlantic County to interview Booker where he was in custody.
(Id. 168:11.)  Roselli initially advised Defendant of his rights
and provided Booker with an FD-395 advice of rights form.  Booker
signed the form, which also contained a waiver of rights
provision.  (Govt. Ex. 5.)  After Booker executed the advice of
rights form, Booker admitted his involvement in one of the

---

[4] The Government has represented to the Court that it will
not seek at trial to offer into evidence any fruits of that
search.  Defendant's motion to suppress any items seized from
Room 309, other than the guns and ammunition will be dismissed as
moot.

robberies Roselli was investigating.  (Roselli at 171:10-17.)
Moreover, according to Roselli, Booker voluntarily offered
information regarding the Atlantic City investigation.  (Govt.
Ex. 7.)

On December 8, 2004, Roselli returned to Atlantic County to
meet with Booker.  Roselli provided Booker with the same advice
of rights form, which Booker again signed.  (Id. 173:18-20.)
During the interview, Booker provided additional information
relating to his drug dealing activities.  (Id. at 174:13-175:14.)
Booker also expressed his desire to be federally prosecuted
rather than remain in the State system.  (Id. at 176:3-8; Govt.
Ex. 8.)  According to Roselli, the state charges were ultimately
dropped and were adopted by federal authorities, resulting in a
three count criminal complaint being filed against Booker in the
Eastern District of Pennsylvania.

Later that month, on December 22, 2004, Roselli took Booker
into federal custody.  Prior to transporting Booker to the
federal detention facility in Philadelphia from the Atlantic
County Correctional Facility, Roselli advised Booker of his
Miranda rights, which Defendant waived.  (Roselli Tr. at 177:11-
20; Govt. Ex. 6.)  During the course of transport, Booker, who
was accompanied in the vehicle by Roselli and Detectives Slowik
and Pitts, made several unsolicited comments.  The substance of
those statements was written down by Slovik.  (Govt. Ex. 4.)

After arriving at the FBI Building at 600 Arch Street, the officers brought Booker to the eighth floor where they interviewed him concerning his bank robbery activity.  (Govt. Ex. 9.)  Booker made a number of statements during that session which he now seeks to suppress.  (Id.)

Defendant was indicted on January 19, 2005, and was arraigned on January 27, 2005.  Counsel was subsequently appointed on or about February 1, 2005.[5]  On April 25, 2005, upon the motion by Defendant to transfer venue, this matter was ordered transferred from the Eastern District of Pennsylvania to this Court by the Honorable Stewart Dalzell, District Judge for the Eastern District of Pennsylvania, pursuant to Rule 21(b), Fed. R. Crim. P.  Defendant subsequently moved to suppress certain evidence and statements.  [Docket Item 7.]  The Court held suppression hearings on July 20, 2005 and July 21, 2005 and heard oral argument by counsel at a hearing on August 11, 2005.

---

[5] On April 4, 2005, Roselli retrieved Booker from the Marshals holding facility in Philadelphia to execute a federal search and seizure warrant authorizing collection of DNA and hair samples from Booker.  (Govt. Ex. 15.)  During the search, Booker told Roselli that he had assaulted Blickley and that he would do it again given the opportunity.  (Roselli Tr. at 183:1-8.)  Depending on whether the Government intends to introduce this statement at trial, the Court will rule on its admissibility at the same time it decides whether to suppress the statements made by Blickley.

## II.  DISCUSSION

Defendant seeks to suppress the two guns which were seized from the Hotel trash can, the 149 grams of crack seized from his jacket following his arrest, and various statements made to officers during and following his arrest.  First, Defendant argues that the guns should be suppressed as fruits of an unlawful search of the Hotel room.  Defendant further contends that because the arresting officers would not have had probable cause but for the guns, the Court must also suppress the drugs.

As the discussion below explains, however, the Court finds that Booker relinquished any expectation of privacy in the guns by abandoning them in the Hotel trash can.  Accordingly, Defendant has no standing to seek suppression of the guns at trial.  Moreover, because New Jersey law attaches a presumption of unlawfulness to possession of handguns, see N.J.S.A. 2C:39-2(b) and 2C:39-5(b), the arresting officers had probable cause to arrest Booker following the seizure of the guns.

In the alternative, the Court finds that even if Booker did not abandon the two guns, there existed exigent circumstances which justified the warrantless entry into Room 309 and the subsequent limited search of the trash can.  Additionally, even if this Court were to suppress the guns, the arresting officers would have had probable cause to arrest Booker in light of the information they possessed concerning the presence of the guns in Booker's room.

10

Finally, Defendant seeks the suppression of various statements made to state and federal law enforcement agents during and following Booker's arrest.  The Court concludes that the statements were made voluntarily, and that their introduction at trial does not violate the Fifth Amendment.[6]

A.    <u>Guns</u>

Defendant first seeks suppression of the guns found in the bathroom trash can as the fruits of an unlawful search.  The Court finds that Defendant relinquished his expectations of privacy in the guns once he abandoned them in the trash can.  Thus, Booker does not have standing to object to their admission at trial by the Government.

Although a person has a reasonable expectation of privacy in the contents of his hotel room, <u>see</u> <u>Hoffa v. United States</u>, 385 U.S. 293, 301 (1966), he forfeits that interest when he abandons that property.  <u>Abel v. United States</u>, 362 U.S. 217, 241 (1960).  "Abandonment for purposes of the Fourth Amendment differs from abandonment in property law; here the analysis examines the individual's reasonable expectation of privacy, not his property interest in the item."  <u>United States v. Fulani</u>, 368 F.3d 351, 354 (3d Cir. 2004).  A court is required to determine from an

---

[6] Once again, Defendant additionally seeks suppression of certain post-indictment statements allegedly made to Blickley. With the exception of those statements, the Sixth Amendment is not implicated by Defendant's motion and, thus, will not be discussed herein.

objective viewpoint whether property has been abandoned for purposes of the Fourth Amendment analysis.  Id. (citing United States v. Perkins, 871 F. Supp. 801, 803 (M.D.Pa. 1995), aff'd, 91 F.3d 127 (3d Cir. 1996)).  "Whether abandonment occurred is a question of intent which may be inferred from acts, words, and 'other objective facts.'"  United States v. Ramos, 12 F.3d 1019, 1022-23 (11th Cir. 1994) (quoting United States v. Pirolli, 673 F.2d 1200, 1204 (11th Cir.), cert. denied, 459 U.S. 871 (1982)).  "Proof of intent to abandon property must be established by clear and unequivocal evidence."  Fulani, 368 F.3d at 354 (citing United States v. Moody, 485 F.2d 531, 534 (3d Cir. 1973)).

In Abel, 362 U.S. at 241, the Supreme Court held that items seized by officers from the wastebasket of the defendant's hotel room should not have been suppressed.  The Court concluded that "petitioner had abandoned these articles.  He had thrown them away.  So far as he was concerned, they were bona vacantia. There can be nothing unlawful in the Government's appropriation of such abandoned property."[7] Id. (citing Hester v. United States, 265 U.S. 57, 58 (1924)).

---

[7] To be sure, the Court in Abel had initially found that the entry into the hotel room was entirely lawful because the defendant had vacated the room prior to the search.  362 U.S. at 241.  That determination, however, was not necessary to the Court's conclusion regarding the lawfulness of the seizure. Specifically, as is the case here, even if the entry into the room were unlawful, the defendant forfeited standing to object to the seizure by abandoning the property.  In any event, as explained below, the Court here is convinced that the exigencies surrounding the search in this case also justified the warrantless entry and seizure of the weapons from the wastebasket.

Similarly here, the Court finds that by discarding the guns into the bathroom trash receptacle, Defendant abandoned them. Like any hotel guest, Booker provided "permission, either implied or express, to maids, janitors, repairmen, and other similarly employed workers to enter [his] room in order to perform their routine duties, including tidying and replenishing the room and making requested repairs." United States v. Pope, 2003 U.S. Dist. LEXIS 16786, at *11-12 (W.D.Va. Sept. 23, 2003) (citing Stoner v. California, 376 U.S. 483, 486 (1967)).  The Best Western Envoy Hotel had the policy and practice of daily maid service, including removal of items placed in the bathroom trash receptacle, (Pillay Tr. at 137:21-138:8,) as Defendant well knew from having stayed there for several days.  The maid, Petra Ramirez, was performing her normal cleaning and trash removal service in the early-afternoon when she went to empty the trash and saw the guns in the wastebasket.  Booker was, thus, aware that the trash bin would be emptied, and his guns discarded.  As such, Booker's intent to abandon his weapons is easily discernable from his placement of the guns in the trash.[8] Because

---

[8] The Government also argues that Booker lost any privacy interest in the room when the Hotel effectively evicted him by changing the locks to the room.  That argument is flawed.  In the first instance, the locks were changed at the request of the officers.  In any event, the lockout occurred after the officers first entered Room 309 and seized the guns.  Thus, at best the police, not the hotel, were the ones who ordered the eviction and entry; at worst, there was an entry before eviction.  In either case, the Government's eviction argument fails.

Booker abandoned the two guns, he has no standing to object to
the lawfulness of their seizure, regardless of whether the
officer's entry into the room constituted an unlawful search.

Nonetheless, in this case the officer's warrantless entry
into the room was justified by the exigencies surrounding the
search.  "Before agents of the government may invade the sanctity
of the home, the burden is on the government to demonstrate
exigent circumstances that overcome the presumption of
unreasonableness that attaches to all warrantless home entries."
Sharrar v. Felsing, 128 F.3d 810, 820 (3d Cir. 1997) (quoting
Welsh v. Wisconsin, 466 U.S. 740, 750 (1984)).  The sort of
exigencies that justify a warrantless entry include "hot pursuit
of a fleeing felon, or imminent destruction of evidence, . . . or
the need to prevent a suspect's escape, or the risk of danger to
the police or to other persons inside or outside the dwelling."
Sharrar, 128 F.3d at 820 (quoting Minnesota v. Olson, 495 U.S.
91, 100 (1990)).

Here, it is the last of these circumstances which confronted
the officers upon arrival at the Hotel.  As recounted above, the
five officers present during the search of Room 309 were
legitimately concerned for their safety as well as the safety of
other hotel guests.  In the first place, the officers did not
know whether there were additional occupants besides Booker in
the room.  Moreover, as there were three separate entrances by

which one could gain access to the Hotel, the officers were fearful that Booker or another individual had entered the room without their knowing.  Finally, the officers were not certain whether there were connecting doors to Room 309 by which an individual from an adjacent room could have gained access to the guns.  In fact, as Officer Petinga testified, it was common in that hotel for rooms to connect to one another through connecting doors.  (Petinga Tr. at 53:20-22.)  That the officers entered Room 309 with guns drawn evidences these fears.

Next, the scope of the search was limited to the exigencies which were present.  Specifically, once inside the room, the officers searched nothing more than the bathroom trash can, located a mere three feet from the entrance to the room. Moreover, once the guns were received, no other search of the room was conducted by any of the officers.  In short, the Court concludes as a matter of law that exigencies were present justifying the warrantless entry into the room and that the search was sufficiently tailored to those exigencies.

B.   <u>Drugs</u>

Following the seizure of the guns, the officers set up
surveillance throughout the Hotel.  At approximately 7:30 p.m.,
Booker and Thompson were arrested as they attempted to gain
access to Room 309.  A search incident to Booker's arrest yielded
roughly 149 grams of crack in Booker's jacket.  The arresting
officers did not have an arrest warrant, and Booker now seeks to
prevent the Government from introducing the drugs at trial.
Because the officers had probable cause to arrest Booker and
because the search incident to that arrest was lawful, the drugs
will not be suppressed.

"In conformity with the rule at common law, a warrantless
arrest by a law officer is reasonable under the Fourth Amendment
where there is probable cause to believe that a criminal offense
has been or is being committed."  <u>Devenpeck v. Alford</u>, 125 S. Ct.
588, 593 (2004) (citing <u>United States v. Watson</u>, 423 U.S. 411,
417-24 (1976)).  The existence of probable cause depends upon the
reasonable conclusion which could be drawn by the arresting
officers at the time of the arrest.  <u>Id.</u>  Moreover, it is well-
settled that once the arrest is made,

> it is reasonable for the arresting officer to search
> the person arrested in order to remove any weapons that
> the latter might seek to use in order to resist arrest
> or effect escape. . . .  In addition, it is entirely
> reasonable for the arresting officer to search for and
> seize any evidence on the arrestee's person in order to
> prevent its concealment or destruction. . . .  There is
> ample justification, therefore, for a search of the

16

arrestee's person and the areas "within his immediate
control" – construing that phrase to mean the area from
which he might gain possession of a weapon or
destructible evidence.

Chimel v. California, 395 U.S. 752, 762-63 (1969); see United
States v. Samuels, 2004 U.S. Dist. LEXIS 1296, at *19 (E.D.Pa.
2004) (denying motion to suppress drugs discovered on the
defendant's person following search incident to arrest for gun
possession).

In the instant case, the officers seized two handguns from
Booker's hotel room.  Under New Jersey criminal code, N.J.S.A.
2C:39-2(b) and 2C:39-5, possession of a handgun is presumed
unlawful.  The room was registered to Booker, and he was
identified as the occupant based on the retained copy of his
photo identification at the front desk.  The officers thus had
probable cause to arrest Booker even in the absence of any
additional information.[9]  As it turns out, though, the information
the officers possessed at the instant of arrest only bolsters a
finding of probable cause.  Specifically, the officers knew that

---

[9] As noted above, "[a]bandonment for purposes of the Fourth
Amendment differs from abandonment in property law; here the
analysis examines the individual's reasonable expectation of
privacy, not his property interest in the item."  Fulani, 368
F.3d at 354.  Therefore, once the guns were discarded they may
still have been in Booker's possession for purposes of New Jersey
criminal law without Booker having retained an expectation of
privacy in the guns for purposes of the Fourth Amendment.  That
there was probable cause to believe that the handguns had been in
Booker's possession was sufficient for probable cause to arrest,
even where the arrest occurred after abandonment.

Booker had a criminal history and that he was spotted loitering in the early morning hours of a high drug traffic area.  The officers learned the day before that there was a warrant for Booker's arrest.  Taken together with the fact that Booker had two handguns in his hotel room, the officers had probable cause to believe that Booker had committed a crime.[10]

Subsequent to arrest, it is well-established that the arrestee's clothing or other items in his immediate control may be searched.  Chimel, 395 U.S. at 762-63.  Here, the arresting officers saw Defendant attempting to shield his jacket with his body on the floor, and the officers wisely kicked the jacket away and inspected it, finding the crack cocaine.  Accordingly, the warrantless arrest and subsequent search of Booker's jacket were lawful.  The drugs will not be suppressed.

---

[10] As already mentioned, Defendant argues that the officers would not have had probable cause to arrest Booker if they had not first seized the guns from his hotel room in violation of the Fourth Amendment.  In the first instance, as the discussion above elucidates, the seizure of the guns was lawful.  In any event, even in the absence of the guns themselves, the officers possessed reliable information from the hotel management that Booker had guns in his room.  Thus, even if the fact of the guns were inadmissible, the information pertaining to the guns (especially taken together with the additional facts the officers possessed) would have been sufficient to establish probable cause for the arrest.

C.    <u>Statements</u>

Finally, Defendant seeks to suppress certain statements made to law enforcement officials made during and subsequent to his arrest:

(a)    October 29, 2004 reference to "guns";

(b)    November 30, 2004 statements to Special Agents Roselli and Fury;

(c)    December 8, 2004 statements to Special Agents Roselli and Perzichilli; and

(d)    December 22, 2004 statements to Special Agents Roselli and Julia K. Wriglesworth.[11]

First, Booker seeks to suppress the reference to guns which he made to the arresting officers on October 29, 2004.  The exchange culminating in that statement was recounted by Sergeant Pincus during the suppression hearing as follows:

> I told him he was under arrest.  He didn't comply right away.  I told him to put his hands up and get down on his knees.  And as he was slowly putting his hands up, he said to me what am I under arrest for?  And I said because something we had found in the room.  And then he just spontaneously said "guns," like that.  And it appeared that he was relieved it was guns.

(Pincus Tr. at 67:14-20.)  Booker didn't say anything beyond the volunteered remark "guns," according to Sergeant Pincus.  (<u>Id.</u> at 70:25-71:3.)  Defendant argues that the arresting officer's

---

[11] Defendant also references in his Brief certain statements made by Booker to state law enforcement officials on November 2 and November 10, 2004.  (Def. Br. at 4.)  As it appears that the Government does not intend to introduce those statements at trial, the Court will not address the merits of Defendant's argument herein.

response to Booker's question was calculated to elicit an incriminating response from Booker in violation of his Miranda rights.  (Def. Br. at 22.)  Defendant is mistaken.

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court

> concluded that in the context of "custodial interrogation" certain procedural safeguards are necessary to protect a defendant's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination.  More specifically, the Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."

Rhode Island v. Innis, 446 U.S. 291, 297 (1980) (quoting Miranda, 384 U.S. at 444).  "The Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."  Innis, 446 U.S. at 300-01.  Thus, for example, in Innis the Court concluded that the defendant was not interrogated within the meaning of Miranda when the defendant made an unsolicited statement to officers.

In the Innis case, the defendant was arrested following an armed robbery and advised of his Miranda rights several times. The officers, though, were not able to recover the gun used in the robbery.  While en route to the police station, two of the officers expressed to one another their concerns that the missing gun could pose a danger to the area school children.  Hearing that discussion, the defendant interrupted the officers to alert them that he knew where the gun was and to request that he be

20

allowed to show them the gun's location.  The officers obliged
and the gun was recovered shortly thereafter.  The Court held
that the defendant was not interrogated within the meaning of
Miranda and, thus, that his statement to the officers regarding
the whereabouts of the gun should not be suppressed.  Innis, 446
U.S. at 302.

Defendant's argument for suppression here is even weaker
than in Innis.  This Court credits Sergeant Pincus's testimony.
In the first place, Booker initiated the conversation with the
arresting officers by asking the reason for his arrest.
Moreover, Officer Pincus's reply did not invite  further comment
by Booker.  Indeed, in response to Booker's question to the
officers, Pincus informed Booker that the officers had already
recovered the items from the room.  Any further statement by
Booker was, thus, unsolicited.  For those reasons, the October
29, 2004 statement will not be suppressed.

Additionally, Booker seeks to suppress subsequent statements
made to law enforcement officials.  Because this Court credits
the testimony that Booker was advised of his rights prior to
making each of the statements, and because he voluntarily waived
the same in each instance, those statements will likewise not be
suppressed.  Specifically, on November 30, December 8 and
December 22, Booker voluntarily signed FD-395 Advice of Rights
forms advising him of his Miranda rights and providing for waiver
of those rights.  (Govt. Exs. 5, 6.)  In short, the Court will
not suppress any of the statements made by Booker.

**III. CONCLUSION**

For the reasons explained above, the Government may seek at trial to introduce Booker's guns, drugs and statements, and Defendant's motions are denied.  With respect to Defendant's motion to suppress statements he allegedly made to fellow inmate Blickley after Defendant was represented by counsel herein, in violation of the Sixth Amendment right to counsel, the hearing remains open and the Court will convene an additional suppression hearing prior to trial so that Defendant may have an opportunity to cross-examine Blickley.


September 9, 2005                          **s/ Jerome B. Simandle**
Date                                      JEROME B. SIMANDLE
                                          U.S. District Judge