IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | HON. JEROME B. SIMANDLE |
| v. | Criminal No. 05-313 (JBS) |
| CHRISTOPHER BOOKER, | |
| Defendant. | **OPINION** |

APPEARANCES:

Christopher J. Christie
United States Attorney
By:  Joseph T. Labrum, III
     Special Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
615 Chestnut Street
Suite 1250
Philadelphia, Pennsylvania 19106
     Attorney for the United States of America

Lori M. Koch, Assistant Federal Public Defender
FEDERAL PUBLIC DEFENDER'S OFFICE
800-840 Cooper Street
Suite 350
Camden, New Jersey 08102
     Attorney for Defendant Christopher Booker

**SIMANDLE**, U.S. District Judge:

Defendant Christopher Booker has been charged in a three count criminal indictment with conspiracy to distribute and possess with intent to distribute more than 50 grams of cocaine base in violation of 21 U.S.C. § 846, possession with intent to distribute approximately 149.5 grams of cocaine base in violation of 21 U.S.C. § 841(a)(1), and possession of two firearms in furtherance of a drug trafficking felony in violation of 18 U.S.C. § 924(c).

The Government seeks to introduce at trial statements allegedly made by Defendant to a jailhouse informant while incarcerated and outside the presence of counsel.  Defendant has moved to suppress those statements under the Sixth Amendment. For the following reasons, that motion will be granted in part and the Court will permit the Government to introduce only certain of the challenged statements at trial.

I.   **BACKGROUND**

The Court will summarize the facts only that bear upon the issues presented by this motion to suppress.

On October 29, 2004, Defendant was arrested at the Best Western Envoy Hotel in Atlantic City, New Jersey, for unlawful possession of firearms.  The incident search of Booker's jacket revealed roughly 149 grams of crack cocaine.  Following his arrest, Defendant was eventually put into custody at the Federal Detention Center ("FDC") in Philadelphia.[1] According to testimony offered at the suppression hearing, while Booker was incarcerated in early January, 2005, he approached another inmate in the prison law library in search of legal advice.  The inmate whom Booker asked for help was David Blickley.

According to his testimony, Blickley was generally known among the prison population as "jailhouse lawyer."  In fact, at

---

[1] On or about January 19, 2005 Defendant was indicted. Counsel was subsequently appointed on or about February 1, 2005.

2

the time he was approached by Booker, Blickley was preparing a legal writing for another inmate.  Blickley testified that after Booker approached him, Blickley told Booker to wait roughly ten minutes.  After that time elapsed, Blickley told Booker that he would help with him with his legal questions, but that Booker would have to be "completely truthful" regarding the facts of his case.  According to Blickley, Booker then proceeded to tell him about having been arrested in Atlantic City, and that he was charged with possession of guns and drugs.[2] Booker then allegedly asked Blickley to do legal research for him regarding a statement he had given to the police and the search of the hotel room where the guns were found.

For each of the next twenty or so days, Booker and Blickley met in the law library and in each other's cells to talk about Booker's case.  Blickley testified that he researched legal questions for Booker during this time, but at no time asked Booker any questions.  According to Blickley, he made notes of his conversations with Booker on scraps of paper which he discarded.  Blickley claims he took more detailed notes of his conversations with Booker between February 3 and February 8,

---

[2] Blickley testified that Booker additionally confessed to other crimes not charged in this Indictment.  Pursuant to this Court's Order dated January 23, 2006, the Government is prohibited from making references to those crimes during this trial.

2005, and that on February 9 or 10 he created a handwritten four-page detailed summary of all the information he had learned from Booker during the more detailed meetings.  (See Ex. G-11.)

In addition to being a "jailhouse lawyer," however, Blickley was, apparently unbeknownst to Booker, an experienced informant who had been providing information to various federal agencies since his arrest on a Hobbs Act robbery in 1998.  According to Blickley, since 1998 he has cooperated against approximately seven different individuals.  As a result of his cooperation in one of those matters, the Government filed a motion in 2001 under Rule 35(b), Fed. R. Crim. P., seeking a sentence reduction for Blickley,[3] who is currently serving a 300-month sentence plus 27 months' consecutive sentence for federal escape.

At the same time Blickley was ostensibly helping Booker with his case, he was cooperating with the Government on other unrelated matters as well.  In fact, Blickley was being housed at the FDC in Philadelphia when Booker first approached him in January 2005 in connection with his cooperation in one of those other matters, a drug case.  On January 25, 2005, Special Agent

---

[3] Decision on the Rule 35 motion has been deferred pending further investigation and assistance.  No court date has yet been set.

Heaney was proffering Blickley in yet another matter when Blickley volunteered certain information regarding Booker.[4]

Specifically, during the January 25 proffer session with Heaney, Blickley allegedly stated that he had met Booker who had described his involvement in a bank robbery and a murder. Special Agent Heaney believed this information would be of particular interest to Special Agent Roselli, who Heaney knew at the time was investigating Booker's alleged involvement in the present drug distribution crimes.  Heaney contacted Special Agent Roselli by telephone, and Roselli immediately left his office to interview Blickley.

During that meeting, Blickley stated to Special Agent Roselli that Booker had come to him for legal advice, and that Booker had confessed to certain crimes.  Roselli received Blickley's oral statements about Booker on January 25th.  Roselli testified that he instructed Blickley not to ask questions of Booker in any subsequent meetings, and that he was not to act as an agent of the Government.  Special Agent Roselli testified that Blickley said he was familiar with the "rules," and that he would not question Booker.  Blickley furnished no notes to Roselli at the January 25th interview.  Special Agent Roselli subsequently

---

[4] Heaney was interviewing Blickley in connection with his alleged knowledge of "a threat against the court" in the Eastern District of Pennsylvania, unrelated to Booker or to the present case in any way.

prepared a fairly detailed contemporaneous summary of his January 25th interview of Blickley, in evidence as Ex. G-14.

        After the January 25th meeting, Blickley became more detailed-oriented and elicited much more incriminating information from Booker.  He interviewed Booker every day and kept track, for the first time, of the dates of the conversations and of what Booker said on each date.  After these meetings, Blickley made notes, which he compiled on or about February 9th into a four page summary detailing the information he had learned from Booker, highlighting the meetings of February 3-8, 2005, in evidence as Ex. G-11.  Blickley did not meet Agent Roselli again until March 23, 2005.  In early March, 2005, at a proffer with Assistant United States Attorney Labrum on another unrelated investigation,[5] Blickley turned over to AUSA Labrum this four-page hand-written summary.  (See Ex. G-11.)  According to Blickley, AUSA Labrum immediately called Special Agent Roselli to tell him about Blickley's notes.  As a result of the information Blickley provided, AUSA Labrum and Special Agent Roselli set up a proffer session with Blickley in this matter on March 23, 2005.

_____

        [5] This investigation concerned Frank Davis.  Special Agent Roselli testified, based on his recollection of when AUSA Labrum so advised him, that Blickley turned over the written report on March 4 or 5, 2005.

## II. DISCUSSION

The Sixth Amendment provides in part that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI. The Sixth Amendment protects a defendant who is represented by a lawyer in an adversary proceeding from being questioned by any agent or employee of the government about his case outside the presence of his attorney.  The Sixth Amendment therefore precludes the government from using an informant to directly interrogate a fellow inmate about his pending case, and any statement of the accused procured in violation of the Sixth Amendment must be suppressed.  According to the Third Circuit, there are "three basic requirements for finding a Sixth Amendment violation: (1) the right to counsel must have attached at the time of the alleged infringement; (2) the informant must have been acting as a 'government agent'; and (3) the informant must have engaged in 'deliberate elicitation' of the incriminating information for the defendant."  Matteo v. Superintendant, SCI Albion, 171 F.3d 877 (3d Cir. 1999) (citing Maine v. Moulton, 474 U.S. 159, 170-71 (1985); United States v. Henry, 447 U.S. 264, 269-70 (1980)).

Here, it is undisputed that at the time Defendant allegedly made the challenged statements to Blickley, his Sixth Amendment

right to counsel had already attached.[6] The narrower issue before the Court is whether Blickley acted as a government agent and whether he deliberately elicited those statements in violation of that right.

For the following reasons, the Court holds that prior to Blickley's January 25, 2005 meeting with Special Agent Roselli, Blickley was not acting as a government agent.  Also, the Court concludes that Blickley did not deliberately elicit Booker's inculpatory statements, which Booker volunteered in order to get informal legal help from Blickley, prior to that meeting.  The pre-January 25th statements will, thus, not be suppressed.  However, the Court finds that following the January 25th meeting, Blickley became an agent of the Government with respect to this case, and he deliberately and systematically elicited and made records of Booker's inculpatory conversations.  Accordingly, the Court will suppress Booker's statements deliberately elicited by Blickley after January 25, 2005.

---

[6] Generally, the Sixth Amendment right to counsel attaches "only after the initiation of adversary judicial proceedings against the defendant."  United States v. Gouveia, 467 U.S. 180, 187 (1981).  Such proceedings include "formal charge, preliminary hearing, indictment, information, or arraignment."  Kirby v. Illinois, 406 U.S. 682, 689 (1972).  Here, at the time Defendant allegedly made the statements to Blickley, Defendant had already been formally charged and counsel was appointed.  Thus, his Sixth Amendment right to counsel had already attached in this case.

      A.   Pre-January 25th Statements

According to Blickley's testimony, Defendant approached Blickley sometime in the early part of January 2005 in the prison library.  At the time, Blickley, a "jailhouse lawyer" known for informally helping inmates with their legal matters, was preparing a legal writing for another inmate.  After Defendant asked for assistance, Blickley allegedly said nothing more to Booker than that he should be "completely truthful" regarding the facts of his case; otherwise, Blickley told Booker, he would not be able to provide effective assistance.  Defendant proceeded to divulge detailed information pertaining to the instant matter.[7] Blickley and Booker had similar conversations almost every day for the next twenty or so days.[8] When Blickley met with government agents on January 25th, he attempted to recount from his recollection all of the information he had gathered from Booker over the prior several weeks.[9]

---

[7] As already noted, Defendant also allegedly told Blickley details relating to a bank robbery and murder.  The Court will not permit references to those matters either through Blickley's testimony or otherwise, in light of their highly prejudicial nature under Fed. R. Evid. 403, as previoulsy determined

[8] Following some of those conversations, Blickley allegedly made notes on small pieces of paper which contained information that Booker had divulged.  There are inconsistencies in Blickley's statements about whether those notes existed.

[9] The extent and detail of that information is reflected in the FBI Form 302 prepared by Special Agent Roselli following the January 25th meeting.  (Ex. G-14.)

For the following reasons, the Court holds that Blickley was not acting as an agent of the government prior to January 25, 2005, and that in any event he did not deliberately elicit incriminating statements from Booker during that time.  Thus, Defendant's Sixth Amendment right will not be violated by introduction of the pre-January 25th statements at trial.

### 1.   Blickley's Status as a Government Agent

"In its sole case focusing on a determination of government agency, the Supreme Court found the informant was an agent because he was paid and 'acting under the instructions' from the Government."  Matteo, 171 F.3d at 893 (quoting Henry, 447 U.S. at 270).  The Third Circuit has therefore held that "[a]n inmate who voluntarily furnishes information without instruction from the government is not a government agent, even if the informant had been an agent in the past."[10] United States v. Brink, 39 F.3d at 423 (citing United States v. Van Scoy, 654 F.2d 257, 260 (3d Cir.), cert. denied, 454 U.S. 1126 (1981)).  See also United States v. D.F., 63 F.3d 671, 682 n.16 (7th Cir. 1995) (key inquiry is whether "the government directed the interrogator toward the defendant in order to obtain incriminating

---

[10] To be sure, under Brink it appears that the government need not explicitly instruct an informant to cooperate against a particular defendant in order for that informant to be considered a government agent.  171 F.3d at 424.  Indeed, as the Court discusses below, a "tacit agreement" is likely sufficient to establish agency.  However, without some "instruction" from the government, an informant can not be a government agent.  Id.

information"); <u>Stano v. Butterworth</u>, 51 F.3d 942, 977 (11th Cir. 1995) (no evidence to support prearrangement between informant and government regarding defendant); <u>Robinson v. Clarke</u>, 939 F.2d 573, 576 (8th Cir. 1991) (where government had not asked informant to solicit information while in prison, no Sixth Amendment violation); <u>United States v. Watson</u>, 282 U.S. App. D.C. 305, 894 F.2d 1345, 1347-48 (D.C. Cir. 1990) (government informant was not instructed to obtain information from defendant; entrepreneurial acts did not violate defendant's Sixth Amendment rights); <u>Brooks v. Kincheloe</u>, 848 F.2d 940, 945 (9th Cir. 1988) (even though informant solicited information from defendant before going to the police, informant had not been asked to obtain information from defendant).

In <u>Henry</u>, beyond finding that the government had instructed the informant to provide information about the defendant, the Supreme Court cited the following additional factors supporting its finding of agency.  First, the informant there had been a paid government informant for more than one year and had a contingency-fee arrangement in place whereby he would be paid if he provided useful information.  <u>Henry</u>, 447 U.S. at 270.  Next, the Court noted that the informant was ostensibly no more than a fellow inmate of the defendant.  <u>Id.</u>  Finally, the defendant there was in custody at the time, therefore making him particularly susceptible to the ploys of government agents.  <u>Id.</u>

As the Third Circuit has explained, though, the Court in Henry did not attempt to articulate "a rule defining government agency for future cases . . . ."  Matteo, 171 F.3d 893. Accordingly, the Third Circuit has considered additional factors relevant to the agency analysis.  In Matteo, for example, the court explained that the existence of trust between an informant and a defendant weighs in favor of finding an agency relationship.[11] Id. at 894.  In that case, the court found that because the defendant and the informant were long-time friends, the police knew that the defendant would be more likely to make incriminating statements to the informant.  Id. at 895.  See Henry, 447 U.S. at 274 (noting that informant had "managed to gain the confidence" of the defendant).

Here, the Court holds that prior to the January 25th meeting, the Government did not instruct Blickley, explicitly or otherwise, to gather information from Booker.  Indeed, until the January 25th meeting, the Government had never mentioned Booker's name to Blickley, and Blickley had never mentioned Booker to the Government.  No governmental agent, attorney or other official knew, prior to January 25, 2005, that Blickley was doing legal

---

[11] Importantly, in Matteo the court was reviewing the denial of a habeas corpus petition under AEDPA.  The court held that the Supreme Court had not announced a rule in Henry "of sufficient specificity to merit 'contrary to' review."  171 F.3d at 893. Accordingly, the court identified additional factors to be considered in determining whether there is an agency relationship between the informant and the government.

research for, and obtaining information from, Booker, nor even that Blickley intended to obtain information from Booker.  In short, Blickley volunteered Booker's statements at the January 25th meeting without having been so instructed by the Government.

Additionally, Blickley conversed with Booker and received information before January 25th without knowing whether he would receive any benefit from the Government therefor.  See Brink, 39 F.3d at 423 n.5 ("We believe the Court meant that any informant who is offered money, benefits, preferential treatment, or some future consideration, including, but not limited to, a reduction in sentence, in exchange for eliciting information is a paid informant.")  Indeed, implicit in Blickley's testimony was that he did not think that the pending Rule 35 motion applied to his cooperation in this case.  It was when Blickley offered this information to the FBI on January 25th, and the Government showed an interest in Booker, that the expectation of benefit began to shift.  As the Third Circuit has held, courts should "not speculate or infer the existence of a quid pro quo agreement simply because the informant's motives may not have been entirely altruistic."[12] Matteo, 171 F.3d at 894.

_____

[12] Blickley was not a prison paralegal; in fact, he had no employment in the Philadelphia FDC as an inmate.  Although Blickley testified that Booker paid him nothing for his legal services, the Court is not persuaded by that representation. Indeed, according to Blickley it was common for him to receive something for his legal work.  The Court does not find convincing Blickley's testimony that Booker was an exception.  This fact,

13

Moreover, the Court rejects the argument that Blickley's history of cooperation with the Government, even taken together with the pending Rule 35 motion, turned him into a government agent with regard to this case.  To be sure, Blickley had an astonishing history of cooperation with the Government that stretched back to as early as 1998.  Blickley had provided information as an inmate regarding about 7 other persons, including some fellow inmates, before the events in question here; he was awaiting adjudication of the Government's motion for reduction of sentence under Rule 35(b), Fed. R. Crim. P., since 2001, as the investigation triggering that motion was ongoing; he had been moved to FDC Philadelphia in order to cooperate in another matter, and was lodged there when Booker was brought into federal custody in December, 2004 also at FDC Philadelphia.

Blickley's concurrent status as a cooperator in other investigations, however did not convert him into a "roving agent."  See United States v. Birbal, 113 F.3d 342, 346 (2d Cir. 1997) (holding informant's agreement with the government to

_____

however, only serves to support the Court's conclusion that prior to January 25th Blickley was more likely acting on Booker's behalf than as an agent of the Government.
    The Court does not mean to suggest by this statement that Blickley could not have been acting on the Government's behalf simply because he had tricked Booker into paying him for his services.  The Court only notes that the only actual agreement in place prior to the January 25th meeting was the one between Booker and Blickley, not Blickley and the Government.

14

provide "any and all information in his possession relating directly or indirectly to any and all criminal activities or other matters of which he has knowledge," did not transform the informant into a "roving agent").  If the Court were to so hold, anyone who once acted as a jailhouse informant would thereafter by precluded from doing so again since he would forever be labeled an agent.  The Court finds that such an outcome is not only undesirable, but it stretches the Sixth Amendment's protections farther than they were intended to reach.  This is especially true here, where Booker approached Blickley and sought advice, necessarily communicating to Blickley about his ongoing case.  The Sixth Amendment does not require a would-be informant or the government to disregard the information learned this way.

The court in Wallace v. Price, 265 F. Supp. 2d 545 (W.D.Pa. 2003), reached a similar conclusion based on like facts.  There, shortly after the defendant was arrested on murder charges, the would-be informant was arrested and charged in an unrelated matter.  The would-be informant subsequently agreed to testify against his co-defendants, and began to cooperate, working particularly closely with the same officer who was acting as the lead investigator on the defendant's case.  One month later, the informant met with the attorney prosecuting the defendant's case, and told him that he knew the defendant from having been incarcerated together.  Id. at 564.

15

The next month, the informant was released from jail to work as a government informant for the Federal Bureau of Alcohol, Tobacco, and Firearms.  After he completed that assignment, the informant again was arrested and placed in jail.  The defendant was extradited from his place of confinement to the facility where the informant was being held, and placed in the cell next to the informant.  Two days later, the informant gave a formal statement to the lead investigator and the prosecutor with whom he had previously worked – the same investigator and prosecutor working on the defendant's case.  Id. at 565.

Roughly one year later, the informant was sentenced on the multiple charges that had been pending against him for his earlier arrest.  Although the informant had originally agreed to a sentence of five to ten years on these charges, at the recommendation of the government the trial court sentenced the informant to a term of probation and he was immediately released from jail.  Id.  The informant later served as a witness for the prosecution at each of the defendant's trials, testifying that the defendant had confessed to having committed the crimes charged.

The defendant was ultimately convicted and sought habeas corpus relief arguing, inter alia, that the informant's testimony violated his Sixth Amendment right to counsel.  Id. at 564.  In denying habeas relief, the district court adopted the report and

16

recommendation of the Magistrate Judge concluding that the informant was not acting as a government agent at the time he elicited statements from the defendant.  Importantly, the court agreed with the Magistrate Judge's finding that the defendant/petitioner could not demonstrate either (1) that the informant was acting under instructions from the government to obtain information from the government; or (2) that there was a quid pro quo agreement whereby the informant was offered some type of benefit in exchange for his cooperation.[13] Id. at 565.

The facts of Wallace are strikingly similar to those presented here.  Like in Wallace, the informant here had already agreed to cooperate with government officials on an unrelated matter when he first encountered the defendant.  Moreover, in both cases certain government officials working with the informant were at the same time actively involved in the defendant's case.  More specifically, in this case Assistant United States Attorney Labrum was working with Blickley on the Davis prosecution at the same time that he was prosecuting Booker.  Likewise, the FBI was working with Blickley on an unrelated investigation at the time Blickley first offered information on Booker.

---

[13] The trial court had made an explicit finding that the informant's recommended probationary sentence was not connected in any way with the testimony given in the defendant's case. Wallace, 265 F. Supp. 2d at 567.

Notwithstanding Blickley's history of cooperation, this Court holds, as did the court in Wallace, that the absence of any instruction to cooperate defeats the claim that Blickley was acting as a government agent at the time he first provided information to Special Agent Roselli.  See Brink, 39 F.3d at 423 ("An inmate who voluntarily furnishes information without instruction from the government is not a government agent, even if the informant had been an agent in the past.").

For the foregoing reasons, the Court finds that prior to the January 25, 2005 meeting with Special Agent Roselli, David Blickley was not acting as a government agent.[14]

### 2.   Deliberate Elicitation

Next, the Court will address whether Blickley deliberately elicited incriminating statements from Booker prior to the January 25, 2005 meeting.  Because Blickley's communications with Booker prior to January 25th were not "the equivalent of direct police interrogation," the Court holds that there was no deliberate elicitation by Blickley prior to the January 25th meeting.  See Kuhlmann, 477 U.S. at 459 ("[T]he primary concern

_____

[14] In light of this holding, the Court need not reach the question of whether Blickley deliberately elicited the challenged statements from Booker prior to the January 25, 2005 meeting. See Creel v. Johnson, 162 F.3d 385, 393 (5th Cir. 1998) (holding that the agency inquiry is precedent to and distinct from determining whether an agent "deliberately elicits" information). For the reasons now explained, though, the Court holds in any event that Blickley did not deliberately elicit the challenged statements.

of the Massiah line of decisions is secret interrogation by
investigatory techniques that are the equivalent of direct police
interrogation.")

"[T]he use of an informant – even surreptitiously and
through prior arrangement – does not violate the Sixth Amendment
so long as the informant merely listens to and reports the
incriminating statements, rather than affirmatively seeking to
induce them." Matteo, 171 F.3d at 896 (citing Brink, 39 F.3d at
422).  A defendant will not succeed in making a Sixth Amendment
claim "simply by showing that an informant, either through prior
arrangement or voluntarily, reported his incriminating statements
to the police.  Rather, the defendant must demonstrate that the
police and their informant took some action, beyond merely
listening, that was designed deliberately to elicit incriminating
remarks." Matteo, 171 F.3d at 895 (quoting Kuhlmann, 477 U.S. at
459) (emphasis added).

Thus, for example, the Court found deliberate elicitation
where the informant was "not a passive listener" but, rather, had
engaged the defendant in "conversations." Henry, 447 U.S. at
271.  On the other hand, no constitutional violation was found
where police placed a man who had previously agreed to act as an
informant in the same jail cell as the suspect, who proceeded to
make incriminating statements. Kuhlmann, 477 U.S. at 459.
Likewise, in Matteo the Third Circuit held that the Sixth

19

Amendment was not violated where a defendant voluntarily called a friend, who, unbeknownst to the defendant was cooperating with the government, to seek assistance in retrieving a murder weapon. 171 F.3d at 896.

In holding there was no deliberate elicitation, the court in Matteo focused primarily on the voluntary nature of the defendant's disclosures, as well as the relative silence of the informant during the exchange.  First, as the court pointed out, "the entire purpose of Matteo's calls to Lubking was to enlist his help in locating the rifle, a task that necessarily required Matteo to furnish the informant with certain details."  Id. Next, during the course of that exchange the informant "said virtually nothing at all," instead responding "almost exclusively with monosyllabic rejoinders such as 'okay,' 'yeah,' 'uh-huh,' and the like."  Id.

Similarly here, the Court holds that prior to January 25th, neither Blickley nor the Government actively induced Booker to make incriminating statements.  In the first instance, the Government took no action prior to January 25th which was designed deliberately to elicit incriminating remarks.  Indeed, as already noted, no governmental agent, attorney or other official knew, prior to January 25, 2005, that Blickley was obtaining information from Booker, nor even that Blickley intended to obtain information from Booker.

Likewise, the Court finds that Blickley was nothing more than a passive listener during his pre-January 25th meetings with Booker.  Like in Matteo, Booker voluntarily approached Blickley and sought his assistance researching certain legal issues relating to this case.  171 F.3d at 896.  Indeed, the entire purpose of Booker's request was to enlist Blickley's help.  As in Matteo, that task necessarily required Booker to furnish Blickley with details about his case.  Id.  Moreover, Blickley actually furnished advice to Booker, based on research, regarding suppression of evidence in this case and legal issues in other matters, and Blickley drafted a memorandum for Booker that led to the dismissal of unrelated bank robbery charges against Booker under the Speedy Trial Act, according to Blickley's testimony. It is understandable that a lot of talking transpired between Blickley and Booker in January given the range of legal assistance Booker was seeking from Blickley.  That Blickley may have asked certain clarifying questions of Booker during their many conversations, or that Blickley told Booker to be completely truthful, does not alter the voluntariness of Booker's disclosures.  Matteo, 171 F.3d at 897 n.4. ("To hold that Lubking's few clarifying questions constituted 'deliberate elicitation' under Massiah would imply that a Sixth Amendment violation hinged on whether Matteo successfully communicated the rifle's location on the first try.").  In sum, the Court holds

21

that Blickley at no time prior to January 25, 2005 deliberately elicited incriminating statements from Blickley.

For the foregoing reasons, the introduction of the statements allegedly made by Defendant to Blickley prior to the January 25, 2005 meeting will not violate Defendant's Sixth Amendment right to counsel.  Accordingly, the Court will deny Defendant's motion to the extent it seeks to suppress statements made by Booker to Blickley prior to the January 25th meeting.

B.  Post-January 25th Statements

On January 25, 2005, Blickley voluntarily furnished information regarding Booker to the Government without instruction to do so, as discussed above.  Following that meeting, though, the landscape changed.  For the following reasons, those changed circumstances are dispositive of the Court's inquiry as to (1) whether Blickley ultimately became an agent of the Government as against Booker and (2) whether he deliberately elicited the challenged statements from Booker.  For the reasons now explained, the Court will suppress testimony of statements allegedly made by Defendant to Blickley subsequent to the January 25, 2005 meeting.

1.  Blickley's Status as a Government Agent

At the January 25, 2005 meeting, Blickley for the first time became aware of the Government's interest in Booker.  Indeed, once Blickley mentioned Booker's name to Special Agent Heaney, he

22

immediately contacted Special Agent Roselli who then interviewed Blickley.  See Henry, 447 U.S. at 271 n.8 (noting that FBI agent singled out the defendant to the informant as an inmate in whom the agent had a special interest).  Special Agent Roselli then interviewed Blickley in detail.  This fact, taken together with Blickley's history of successful cooperation with the Government and the pending Rule 35 motion, created at the very least an implicit quid pro quo agreement between Blickley and the Government that did not exist before January 25, 2005.  Blickley got the message on January 25th that he should bear down in his efforts and memorialize what he can learn from Booker, and that it could be of help to Blickley for the Government's pending sentence reduction motion that had been based on other cooperation.

In Brink, the Third Circuit recognized that a "tacit agreement" between the government may establish an agency relationship.  39 F.3d at 424.  There, the informant

> testified that he began informing in the hopes of having his sentence reduced.  The government trained him as an informant and at one point a government agent told [him] that his cooperation would be reported to the United States Attorney and the Attorney General. Therefore, [the informant] may have informed on [the defendant] on the reasonable assumption that government officials were aware of his actions and would reward him in the future, if not presently, with a recommendation for a reduction in his sentence.

Id.  Similarly here, the Court finds that the January 25th
meeting Blickley gave rise to a tacit agreement with the
Government with the mutual expectation of a possible sentence
reduction for Blickley arising from informing against Booker,
among others.

Moreover, the Court is not convinced that it is only by mere
coincidence that Blickley became more concerned with the intimate
details of Booker's case, as reflected in his four-page "report"
which he turned over to AUSA Labrum in early March, only after
the January 25, 2005 meeting.[15]  See Henry, 447 U.S. at 270
(holding the informant to be an agent because he was paid and
acting under instructions from the government).  Unlike Matteo,
the informant here has much to gain by cooperating with the
Booker investigation.  Matteo, 171 F.3d at 894 (holding a quid
pro quo whereby the informant receives some type of benefit, even
if not pecuniary, in exchange for his cooperation, evidence of an
agency relationship).  Indeed, it is clear from Blickley's own
testimony that he seeks benefits for his cooperation in this

---

[15] The Court discredits Blickley's testimony that prior to
the January 25 meeting, the reason he did not maintain more
detailed notes was because he feared they would be discovered by
his cell mate.  Notably, Blickley admitted that he had a secured
foot locker in his cell in which he kept valuables, eventually
including the four-page summary report.  (Ex. G-11.)  The Court
believes Blickley first started keeping detailed notes only after
the January 25th interview as Blickley's own purposes as an
informant would be better served by writing and preserving
contemporaneous memoranda of what Booker was telling him each
day.

24

matter.  And, as the Government concedes, the pending Rule 35(b)
motion will apply by its terms to Blickley's cooperation here,
assuming Blickley is truthful in his trial testimony.

For these reasons, the Court holds that following the
January 25, 2005 meeting, Blickley was acting as a government
agent in the Booker matter.

2.   Deliberate Elicitation

Next, the Court concludes that while acting as Booker's
"jailhouse lawyer," after Blickley's January 25th meeting with
Special Agent Roselli, Blickley deliberately elicited statements
from Defendant.  To be sure, as already noted, that Blickley may
have asked clarifying questions of Booker during their
conversations would not by itself amount to deliberate
elicitation.  Matteo, 171 F.3d at 897 n.4 ("To hold that
Lubking's few clarifying questions constituted 'deliberate
elicitation' under Massiah would imply that a Sixth Amendment
violation hinged on whether Matteo successfully communicated the
rifle's location on the first try.").  However, the Court holds
that Blickley's methodical development of information after
January 25th, evidenced by his careful four-page memorandum,
taken together with the fact that Blickley, after January 25th,
began gathering more information than was necessary for purposes
of helping Booker, Blickley actively induced Booker to make

25

incriminating statements.[16] As the Court held in <u>Henry</u>, such deliberate elicitation by a government agent outside the presence of counsel violates the Sixth Amendment.  447 U.S. at 274.

As a consequence, the Court finds that after January 25th, Blickley was acting as a Government agent and that he deliberately elicited incriminating statements from Booker in violation of the Sixth Amendment.  Accordingly, such statements shall be suppressed.

Because Blickley was not eliciting such information as a government agent prior to January 25th, the Defendant's statements to Blickley prior to that date will not be suppressed. Such testimony by Blickley (and by Special Agent Roselli) as to Booker's pre-January 25th admissions will be limited to those statements memorialized in Roselli's memorandum of his interview of Blickley on January 25, 2005.  This limitation, while perhaps proscribing other information known to Blickley before January 25th but unrecorded in his interview by Roselli, is necessary to enforce Defendant's Sixth Amendment rights by avoiding the

_____

[16] Indeed, Blickley's summary report prepared in February and turned over to AUSA Labrum in March (Ex. G-11,) shows Blickley's daily memorialization of Booker's statements to him on February 3-8, 2005, in the same sort of detail as if Blickley were an interrogating agent.  Such detail was no longer necessary for Blickley's legal research efforts, and it could not have been obtained without elicitation.  It is detail-rich, especially compared with the relatively scant information Blickley knew when Agent Roselli debriefed him on January 25th, as described in Roselli's report.  (Ex. G-14.)

possibility that Blickley might blend pre- and post-January 25th conversations together in his recollection at trial.

## III. CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion in part, and permit the Government to introduce only those statements allegedly made by Defendant to Blickley prior to Blickley's January 25, 2005 meeting with Special Agent Roselli.

An Order reflecting this holding was filed on January 23, 2006.[17]

**February 2, 2006**          **s/ Jerome B. Simandle**
Date                          JEROME B. SIMANDLE
                              U.S. District Judge

---

[17] The Court's decision of January 23, 2006, like this Opinion, was based upon the evidence developed at the suppression hearings on January 12 and 18, 2006.  The Order limited the Government's proofs at trial.  This Opinion was finalized while the trial occurred from January 25-31, 2006.  On February 1, 2006, the Jury returned verdicts of Not Guilty on the conspiracy count, and Guilty on the counts charging possession of crack cocaine with intent to distribute and possession of firearms in furtherance of the drug trafficking felony.